Argued and submitted March 2, decision of Court of Appeals affirmed and decision of district court reversed and remanded to district court for further proceedings
April 19, 1988

STATE OF OREGON,
*Respondent on Review,*

*v.*

RONALD RAY DART,
*Petitioner on Review.*

(M360982; CA A44457)

STATE OF OREGON,
*Respondent on Review,*

*v.*

KELLY JOE CUNNINGHAM,
*Petitioner on Review.*

(M454385; CA A44458)

STATE OF OREGON,
*Respondent on Review,*

*v.*

WILLIAM D. FUNDERBURGH,
*Petitioner on Review.*

(M823445; CA A44459)

STATE OF OREGON,
*Respondent on Review,*

*v.*

IRWIN HARCOURT GREENIDGE,
*Petitioner on Review.*

(M824954; CA A44461)

STATE OF OREGON,
*Respondent on Review,*

*v.*

JON LYNN GROSS,
*Petitioner on Review.*

(M815895; CA A44462)

STATE OF OREGON,
*Respondent on Review,*

*v.*

JAMES FRANKLIN HERROD, JR.,
*Petitioner on Review.*

(M743776; CA A44463)

STATE OF OREGON,
*Respondent on Review,*

*v.*

GREGORY WALLACE MURPHY,
*Petitioner on Review.*

(M830887; CA A44466)

STATE OF OREGON,
*Respondent on Review,*

*v.*

ALEXANDER PETERSON,
*Petitioner on Review.*

(M829232; CA A44467)

STATE OF OREGON,
*Respondent on Review,*

*v.*

CHRISTOPHER M. SMITH,
*Petitioner on Review.*

(M460798; CA A44468)

STATE OF OREGON,
*Respondent on Review,*

*v.*

DARCEY ROBERT VISGER,
*Petitioner on Review.*

(M765528; CA A44469)

(SC S34505)

753 P2d 1373

Michael E. Rose and Ann S. Christian, Portland, argued the cause and filed the petition for petitioners on review.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the response to the petition for review were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

JONES, J.

## JONES, J.

We address the issue whether the results of breath tests to determine blood alcohol content (BAC) were properly excluded by the district court judge because the breath alcohol testing instruments allegedly were not properly certified according to state law. The trial court granted defendants' motions to suppress[1] because the court concluded that the instruments were not properly certified. The Court of Appeals reversed the trial court. *State v. Dart,* 87 Or App 124, 741 P2d 538 (1987). We affirm the decision of the Court of Appeals.

Defendants were charged with driving under the influence of intoxicants (DUII). After pleading not guilty, defendants made substantially the same motions to suppress the evidence of the results of their breath tests, which the district court granted. The cases were then consolidated for an appeal by the state.

Defendants alleged that the breath testing instruments used to obtain BAC readings had not been approved for use in the State of Oregon. The district court judge concluded that the instruments used — Intoxilyzer Model 4011A — had not been approved. The court concluded that the analysis of defendants' breath had not been done in accordance with ORS 813.160, and that the evidence was therefore not admissible. In reaching these conclusions, the court made errors as to matters of undisputed fact and as to matters of law.

### THE INTOXILYZER

The record[2] reveals that the instrument used to test BAC is based upon the scientific principle that different chemical elements suspended in a gas will absorb energy from

---

[1] Defendants originally made separate motions to suppress or motions in limine to exclude evidence. All the motions made substantially the same claim:

"The Defendant moves this Court for an Order suppressing all evidence of the chemical test of Defendant's breath for the purposes of determining the alcoholic content of the Defendant's blood * * * for the reason that said chemical test was not performed in accordance with procedures mandated by the applicable Oregon Revised Statutes and the Oregon Administrative Rules."

Defendants all agreed to be bound by the court's decision in the consolidated case before the district judge.

[2] In referring to the record, we mean the findings by the trial court or facts introduced by either party that were not disputed.

different wavelengths of light or other radiation passing through the gas. It is possible to determine the presence or absence of a chemical compound in a gas by determining if certain wavelengths are absorbed by the gas when light or other radiation passes through the gas. The wavelength of the energy is measured in microns.

Ethyl alcohol absorbs the energy of several different wavelengths, including wavelengths ranging from 3 to 4 microns. Radiant energy at this wavelength is commonly referred to as infrared energy, because it has a wavelength longer than that of visible light. The greatest absorption of ethyl alcohol occurs at around 3.39 microns, although there is a range of nearly equal absorption in the entire region from 3.38 to 3.50 microns. It is therefore possible to test a gas for the presence of ethyl alcohol by exposing it to radiant energy in the range of 3.39 microns. As the relative amount of ethyl alcohol in the gas increases, the gas will absorb an increasing amount of energy at this wavelength. An analysis of the absorption of infrared light will reveal the presence and concentration of ethyl alcohol in the gas.

These are the principles of the Intoxilyzer 4011A. The person suspected of driving under the influence of intoxicants blows into a tube, filling the chamber of the Intoxilyzer. The Intoxilyzer flashes a beam of infrared energy through the chamber. As the beam leaves the chamber, the amount of energy remaining unabsorbed in the region of 3.39 microns is measured. If there is no ethyl alcohol in the suspect's breath, no energy in the range of 3.39 microns will be absorbed and the Intoxilyzer will give a reading of 0.00. As the amount of ethyl alcohol increases, more energy will be absorbed and the readout of the Intoxilyzer will display a number representing the level of blood alcohol necessary to produce the given amount of alcohol in the suspect's breath.

Earlier models of the Intoxilyzer (Model 4011) used the wavelength of 3.39 microns to determine the amount of ethyl alcohol in the suspect's breath. However, ethyl alcohol is not the only chemical that might be present in a suspect's breath. Acetone, which may be present in the breath of diabetics or persons who have been fasting to produce a rapid weight loss, absorbs energy in a slightly lower wavelength range. It is

possible, therefore, that a suspect who breathed out a relatively enormous amount of acetone could obtain a minor false reading of the actual BAC from an instrument that based its determination of the presence of ethyl alcohol on absorption at 3.39 microns. Theoretically, an almost incapacitating amount of acetone could produce an increase of not more than 0.01 percent in the report of the BAC. For that reason, later models of the Intoxilyzer 4011A measured absorption in the range of 3.48 microns, which eliminated this potential for error. It is this change in wavelengths used to measure the presence of alcohol that has created the dispute in these cases.

Defendants argue that the Intoxilyzer Model 4011A approved for use in Oregon measured absorption at the 3.39 micron level, while the Intoxilyzer Model 4011A used to determine defendants' BAC measured the absorption of energy at the 3.48 micron wavelength. Defendants contend that even though the 3.48 micron filter would make the Intoxilyzer 4011A more accurate, nevertheless, it was not the instrument approved by the Department of State Police by OAR 257-30-015(1).

■     The district court accepted defendants' arguments that the Intoxilyzers presently in use in Oregon were not of the type approved by the State Police. The trial court then made an error of law by assuming that a change in the wavelength used amounted to such a change that models with a different wavelength could not be included in the existing valid approval of Intoxilyzer Model 4011A.

Having concluded that the Intoxilyzers used to determine the BAC of the defendants in these cases were not of the type approved for use in Oregon, the district judge excluded the Intoxilyzer evidence against defendants.

## APPROVAL OF THE INTOXILYZER 4011A

The record before the district court shows that prior to 1979, the Health Division of the State Department of Human Resources controlled the testing and approval of BAC testing instruments. As part of its duties, the Health Division received and tested several instruments, including the Intoxilyzer 4011 and 4011A. The Health Division approved both models for use in Oregon. OAR 333-13-017. In July 1979, partial control over the program for testing a person's breath

was transferred from the Health Division to the Department of State Police. *Former* ORS 487.815 provided:

"(1)   Chemical analysis of the person's breath, blood or urine, to be valid under ORS 487.815, shall be performed according to methods approved by the Health Division or the Department of State Police and by an individual possessing a valid permit to perform such analysis issued by the Health Division or the Department of State Police.

"* * * * *

"(3)   The Department of State Police shall:

"(a)   Approve techniques or methods of performing chemical analyses of a person's breath."[3]

---

[3] ORS 487.815 has been replaced by ORS 813.160(1), which provides in relevant part:

"To be valid under ORS 813.300:
"* * * * *

"(b)   Chemical analysis of a person's breath shall be performed by an individual possessing a valid permit to perform such analysis issued by the Department of State Police and shall be performed according to methods approved by the Department of State Police. For purposes of this paragraph, the Department of State Police shall do all of the following:

"(A)   Approve methods of performing chemical analysis of a person's breath.

"(B)   Prepare manuals and conduct courses throughout the state for the training of police officers in chemical analysis of a person's breath, which courses shall include, but are not limited to, approved methods of chemical analysis, use of approved equipment and interpretation of test results together with a written examination on these subjects.

"(C)   Test and certify the accuracy of equipment to be used by police officers for chemical analysis of a person's breath before regular use of such equipment and periodically thereafter at intervals of not more than 90 days. Tests and certification required by this subparagraph shall be conducted by trained technicians."

The change in statutes became effective January 1, 1986.

Most of the defendants in this case were arrested and submitted to a breath test on or after January 1, 1986, and thus were prosecuted under the provisions of ORS 813.010(1), which provides:

"A person commits the offense of driving under the influence of intoxicants if the person drives a vehicle while the person:

"(a)   Has .08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person made under the implied consent laws described in ORS 813.100;

"(b)   Is under the influence of intoxicating liquor or a controlled substance; or

"(c)   Is under the influence of intoxicating liquor and a controlled substance."

The remaining defendants were arrested prior to January 1, 1986, and thus were prosecuted under the provisions of ORS 487.540(1) which has substantially similar language.

At the time the State Police became responsible for approving breath alcohol testing instruments, the Health Division already had approved the Intoxilyzer Model 4011 and Model 4011A, based on the Health Division's tests for accuracy. OAR 333-13-017 (1978). The State Police's first response was to adopt temporary regulations continuing the State Health Division's approval, and then, in November 1979, the State Police adopted permanent rules approving the Intoxilyzer Model 4011 and 4011A. OAR 257-30-015(1). The State Police, at the same time adopted other rules setting forth the method whereby other breath alcohol testing instruments could be approved for use in Oregon in the future. OAR 257-30-005(1).

## THE SUPPRESSION HEARING

■ During the motion to suppress hearing, the state introduced a letter from the product applications engineer of CMI, Inc. (CMI), the manufacturer of all the Intoxilyzer Model 4011As in use in Oregon. This letter stated that Model 4011A, which was first produced in June 1977, used a filter which measured infrared energy at 3.48 microns. Defendants offered no evidence which contradicted this evidence. Indeed, defendants' evidence revealed this same information.

Defendants introduced several product brochures from later models of the Intoxilyzer. Many of these brochures did discuss newer Intoxilyzer models by comparing them to Model 4011A. In the course of these comparisons, the brochures discussed the measurement of infrared radiation. Some of the brochures stated that Intoxilyzers measured infrared energy "in the 3.42 micron region." Other brochures stated that the later models (not in question in this case) represent a technical answer to "an infrared instrument which analyzes breath alcohol in the 3.39 micron absorption band," but did not refer specifically to the Model 4011A. One service manual introduced by defendants clearly stated that the Intoxilyzer Model 4011A measured infrared intensity at 3.48 microns.

The trial court found this information confusing:

"The record is confusing, at best, on the issue of the infrared beam as used in the Intoxilyzer 4011A. There appears also to be some question even in the mind of the manufacturer (CMI) as to what infrared beam is used in the Intoxilyzer

4011A. The letter of Jim Parmenter (State's Exhibit 3) indicates that the Intoxilyzer Model 4011A has always operated on a 3.48 micron filter. However, the technical and professional literature distributed by CMI at various times has indicated an infrared filter of 3.39, 3.42 and 3.48."

However, the service manual introduced in evidence shows that the discussion of regions in the brochures refers to the fact that wavelengths from below 3.30 microns to above 3.50 microns all are absorbed by ethyl alcohol. The midpoint of this absorption region is around 3.42 and the greatest amount of absorption of the band takes place near 3.39 microns. These references were not directed to the condition of the 4011A. Discussion of bands used by "an instrument" and wavelength regions is not the same as a clear identification of the wavelength measured by the filter in Model 4011A. There was no evidence to suggest that the 4011A ever measured absorption at anything but the 3.48 micron wavelength.

Perhaps the district judge was confused by a 1978 memorandum from Tom Sears, manager of the Implied Consent Program of the Health Division, to Kristine Gebbie, the Administrator of the Health Division. This memorandum discussed the Health Division's testing of Model 4011A in 1978. In the memorandum, Mr. Sears refers to a brochure from CMI which describes the operation of Model 4011 and states that the 4011 uses a 3.39 wavelength filter. Mr. Sears, without any foundation or firsthand knowledge, then asserted that the Model 4011A also measures absorption at 3.39 microns. There was absolutely no basis for this conclusion shown in the memorandum. As the memorandum states, the difference between Model 4011 and Model 4011A was that while 4011 required the subject to keep the breath light on for 10 to 12 seconds, the 4011A requires only a minimum of three and one-half seconds. There is no reference in the brochure to Model 4011A, let alone to the shorter breath time or to the micron wavelength used by the 4011A.

The district court stated: "All of the literature attached to [the] request [by Mr. Sears for Health Division approval of the Model 4011A] indicates and refers to an Intoxilyzer 4011A operating on an infrared beam of 3.39." A careful reading of the exhibit indicates that the literature attached, which consists of a brochure from the manufacturer, does not

refer in any way to a model number, but does, as mentioned, discuss in its description of the Intoxilyzer's specifications the longer breath input time of the older models.

It appears that the district court overlooked evidence which supports the conclusion that the Model 4011A tested by the Health Division actually did use a filter measuring 3.48 microns. The district court had in the record test reports in the memorandum from Mr. Sears. These report the results of the tests done on the new Model 4011A for acetone sensitivity. As discussed earlier, one of the differences between Intoxilyzers which used a 3.39 micron filter and those which used a 3.48 micron filter concerned acetone sensitivity.

The report of the test results concerning acetone begins with a discussion of tests of breath samples containing compounds "capable of absorbing some infrared energy of 3.39 microns wavelength." The summary reports that acetone levels far higher than those reported in humans were necessary to produce any reading in the Model 4011A, and also states that acetone breath tests of actual human subjects in both the 4011 and the 4011A gave negative results. The testing of abnormally high acetone levels in the 4011A and the comparison of "normal" levels in both the 4011 and the 4011A are consistent with a program to test an assertion by CMI that their new model 4011A had solved any potential problem of acetone sensitivity. This assertion, when it has been made by CMI, has only appeared in references to instruments measuring in the 3.48 micron region.

In sum, there is no evidence to support the district court's assumption that there was ever a change in the wavelengths measured by the 4011A.

From all of this, which did not indicate in any way that the measurement wavelength used in the model 4011A had ever been anything except 3.48, the trial court nevertheless concluded that "there is no evidence in the record that the State of Oregon, the Health Division, or, subsequently, the State Department of Police, understood or approved any Intoxilyzer using any infrared beam other than 3.39." While there was evidence concerning a possible misunderstanding on the part of an employee of the Health Division, this evidence did not speak to the understanding of the State

Police, nor did it directly address the question of the identity of the instruments approved by the State Police.

The district court apparently missed the direct evidence that the filter used in Intoxilyzer Model 4011A had not changed, and reached a conclusion counter to this evidence. The district court also assumed that the Model 4011As presently in use were somehow different from the Model 4011As approved by the State Police. There was no evidence to support this conclusion. The only evidence was that the Intoxilyzers currently in use were acquired prior to or near the time when the State Police first approved the use of Intoxilyzer Model 4011A.

In suggesting that there had been some change in Intoxilyzer Model 4011A since the time of State Police approval, the district court relied much on the fact that the list of approved breath alcohol testing instruments published by the National Highway Traffic Safety Administration (NHTSA) includes several instruments manufactured by CMI, including "Intoxilyzer Model 4011, Intoxilyzer 4011A, and Intoxilyzer 4011A 27-10100." The district court assumed that because these models were listed separately, they were substantively different, and that this difference related to a difference in filter size.

The district court also incorrectly assumed that the Intoxilyzers originally approved were Model 4011As with different serial numbers and, based on this assumption, inferred that the two Model 4011As were different and contained different filters. Unfortunately, these assumptions and inferences resulted in the erroneous conclusion that the models in use had not been approved in accordance with OAR 257-30-005(1) and ORS 487.815(3)(a).[4] The district court's assumption that a difference in filters was the reason for a separate NHTSA listing was counter to the evidence introduced by the state to the effect that filter sizes in the Intoxilyzer Model 4011A had never been changed.

---

[4] The evidence introduced by the defense concerning the NHTSA testing of Model 4011A 27-10100 indicated that this model was tested and approved by NHTSA in May 1977. Thus, it is possible that all Intoxilyzer Models 4011A approved and tested for accuracy by the State Police were of this series, whatever difference there may have been between these and earlier Model 4011As.

Apparently the district court found that the State Police approval of the Intoxilyzers now in use was invalid because it actually had approved an Intoxilyzer which used filters measuring 3.48 while believing that the Intoxilyzers measured 3.39 microns. This assumes that the wavelength used by the instruments had an effect on their accuracy in determining BAC which was important to the State Police. There was testimony from Captain Brooke, who has been in charge of the State Police's approval and testing of BAC instruments since 1979, and from defense witness Ray Grimsbo, that a change in filters would have no effect on the instrument's ability to detect or determine blood alcohol levels. The Health Division had determined that normal amounts of acetone had no effect on either the Model 4011 or Model 4011A, and Captain Brooke testified that it was his belief that acetone levels high enough to produce an effect in either intoxilyzer were extremely unlikely ever to appear. There was no evidence in the record which suggested that the type of filter used was ever important to any agency that approved the Intoxilyzer.

In the opinion disposing of the questions in this case, the district court made three statements which sum up the reasoning of the court:

> "It is clear that the infrared absorption band is the heart of the Intoxilyzer 4011, 4011A and 4011AS. The changing of the infrared beam from 3.39 to 3.48 is a significant change since the bands detect or distinguish between different types of alcohol. Thus, the change in the band constitutes a change in the machine making it a different machine."

The first sentence is undisputed as a description of the theoretical design of the instruments, but would have legal consequences only if a significant change had been made which altered the ability of the instrument to function as originally designed. The intent of the approval and testing procedures is to ensure that a suspect's rights are not infringed through inadequate procedures. *State v. Fogle,* 254 Or 268, 459 P2d 873 (1969). So long as a change in the filters does not change the character of the instrument or the accuracy of the results, the legislation does not require reapproval, any more than reapproval is required if the manufacturer changes the color of the instrument from red to blue. *See City of Salem v. Noble,* 45 Or App 453, 608 P2d 603 (1980).

The district court's second statement quoted above is incorrect, at least with regard to the evidence introduced in these proceedings. The change in the absorption filters is designed to distinguish between the presence or absence of acetone, and not to distinguish between types of alcohol. Thus, the final sentence is based on factual errors, as well as being legally unsupported.

In OAR 257-30-015 the State Police approved Intoxilyzer 4011A, manufactured by CMI. The Intoxilyzer in these cases is a Model 4011A. As did the Court of Appeals, we hold that the Intoxilyzer Model 4011A presently in use and the method by which its use was authorized satisfy all requirements of the relevant statutes and rules.

The decision of the Court of Appeals is affirmed, the decision of the District Court of Multnomah County is reversed, and the case is remanded to the District Court for further proceedings consistent with this opinion.